KOPPEL, INC., Petitioner,

and

Atchison, Topeka and Santa Fe Railway Company, Bunge Corporation and C–G–F Grain Company, Inc., Intervening Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

and

Southern Pacific Transportation Company, Intervening Respondent.

No. 78–1463.

United States Court of Appeals, Tenth Circuit.

Submitted Sept. 14, 1979.

Decided Dec. 26, 1979.

L. John Osborn, Washington, D. C. (Fritz R. Kahn, Andrew P. Goldstein, Washington, D. C., John Jordan, Wichita, Kan., Landon H. Rowland, Kansas City, Mo., Verner, Liipfert, Bernhard & McPherson, Washington, D. C., with him on the brief), for petitioner Koppel, Inc., and intervening petitioners Bunge Corp. and C–G–F Grain Co., Inc.

Leland E. Butler, San Francisco, Cal. (Frederick G. Pfrommer, San Francisco,

Cal., with him on the brief), for intervening petitioner Atchison, T. & S. F. Ry. Co.

John MacDonald Smith, San Francisco, Cal. (Theodore Epstein, Jr. of Epstein, Lozow & Preblud, Denver, Colo., with him on the brief), for intervening respondent Southern Pac. Transp. Co.

H. Glenn Scammel, Atty., I. C. C., Washington, D. C. (Mark L. Evans, Gen. Counsel and Frederick W. Read, III, Associate Gen. Counsel, I. C. C., Washington, D. C., and John H. Shenefield, Asst. Atty. Gen., John J. Powers, III, Asst. Chief App. Section, Peter De La Cruz, Atty., Antitrust Division, Dept. of Justice, Washington, D. C., with him on the brief), for respondents United States of America and I. C. C.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

Koppel, Inc., Bunge Corporation, and C–G–F Grain Company, Inc., petitioners-appellants, hereinafter collectively referred to as Shippers, appeal from a declaratory order of the Interstate Commerce Commission (ICC) finding and concluding that certain provisions of rate two tariffs are not applicable to transcontinental shipments of corn and grain sorghum from Nebraska origin points to destinations in California's Imperial Valley.

Shippers are merchandisers of grain and market grain, who transport their goods from points in Nebraska on the Burlington Northern (BN) railroad lines to the Imperial Valley on the Southern Pacific's (SP) railroad lines. Although the feedlots in the Imperial Valley require grains year round on a regular basis, they are not equipped with adequate storage facilities. Shippers, therefore, maintain grain elevators in Kansas on the lines of the Atchison, Topeka, and Santa Fe Railway Company (ATSF) whereby they can ship stored grain as needed. Shipment via ATSF not only affords Shippers the opportunity to utilize their storage facilities but also affords them "transit privileges", i. e., a break in the transportation between origin and ultimate destination for processing or storage of the commodity without sacrificing the joint through rate.

Under Part 5 of Item 3295, Trans-Continental Freight Bureau Freight Tariff 45–N, favorable rates were allowed for grains moving from Nebraska to California. Under Tariff 45–N, Item 4500, a general routing provision, provided that the gateway routing restrictions published in the General Routing Guide, TCFB Tariff 5 controlled, unless otherwise specifically provided in individual items of Tariff 45–N. Under Tariff 5, SP agreed to accept Imperial Valley bound traffic from ATSF at Deming, New Mexico, and El Paso, Texas, but would not generally interchange such traffic with ATSF at points known as California junctions. Shippers believed that these provisions notwithstanding, Note 33(d)(2) of Item 3295, Tariff 45–N provided an exemption to the general routing provisions and allowed for shipment via ATSF through the California junctions at the lower (Part 5) rates.

From 1972 to 1975 Shippers regularly moved feed grains from Nebraska origins to California destinations via BN–ATSF–California junctions–SP–Imperial Valley at the lower, more favorable Part 5 rates. Questions did arise, however, during this period concerning the applicability of the lower rates over this route. On April 24, 1972, SP wrote one Shipper stating that this route would not apply. Shippers thereafter requested an informal ICC opinion. On July 23, 1973 John R. Kuehn, Chief of the ICC's Section of Rates and Informal Cases, concurred with the Shippers that Note 33(d)(2) did publish an exception to the general routing provisions and permitted the use of a California junction routing to Imperial Valley destinations. Kuehn stated, however, that "It is understood, of course, that the view expressed is informal and not binding upon either the shipper or the carrier . . . .". On April 11, 1974, in a letter written on a three party letterhead, ATSF, BN and SP notified Garvey, a Shipper involved herein, that the three carriers did not agree with Kuehn's informal opinion

and that they "will not be bound by it". It is uncontested that during this period bills of lading were submitted which claimed the disputed rate and route.[1]

On May 3, 1976, SP notified Shippers that it would no longer accept bills of lading for grain shipments routed BN–ATSF–California junctions–SP to Imperial Valley destinations at the lower Part 5 through rate. On June 14, 1976 Shippers filed a petition for declaratory order for tariff interpretation with the ICC seeking a ruling as to whether the lower Part 5 rates were applicable to shipments routed via BN–ATSF–California junctions–SP to Imperial Valley destinations. SP replied, contending that the lower Part 5 rates applied only to shipments via the available gateways in New Mexico or Texas, i. e., Deming or El Paso. On January 4, 1977, the ICC, in a brief order, found in favor of SP.

Upon further petition by ATSF and Shippers to submit additional evidence, the ICC reopened the proceedings on a de novo basis. Thereafter, Shippers filed further evidence with the ICC supported by ATSF, seeking an interpretation permitting routing via California junctions. BN and SP submitted statements in opposition. On October 13, 1977, an ICC Administrative Law Judge (ALJ) entered a decision that the lower rate would not apply over the routing sought by Shippers. On appeal, the ICC affirmed this determination, concluding that Note 33(d)(2) did not establish an exception to the general routing provisions of Tariff 5.

A petition for review was filed with this Court on June 9, 1978, but held in abeyance pending an additional appeal to the ICC.

On March 26, 1979, the ICC, by a full Commission vote, entered a decision affirming its prior decision and that of the ALJ that Shippers were not entitled to the lower rate over the ATSF–California junctions route. The ICC noted, *inter alia*:

> The issue in this proceeding is whether TCFB Tariff 45–N, I.C.C. 1850, Part 5 of Item 3295—series applies on westbound movements of corn and grain sorghum from Nebraska origins to destinations in Imperial Valley, CA. By decision served October 13, 1977, the Administrative Law Judge found that the rates were inapplicable to the movements in question. That decision was affirmed by Division 1 by decision served May 2, 1978 . . .

> \* \* \* \* \* \*

> Tariff 45–N contains a general routing provision, Item 4500, which requires use of gateways listed in TCFB Tariff 5–B, I.C.C. 1674, unless specifically provided otherwise in individual items. Since the routing preferred by petitioners does not pass through gateways specified in Tariff 5–B, the proposed routing is unavailable unless an exception can be found in another item of that tariff.

> Petitioners contend that the prior decisions were in error for failing to recognize that Item 3295, Note 33(d) 2 of Tariff 45–N contains such an exception. Note 33(d) 2 provides as follows:

>> From points on or via the BN when to points taking Rate Basis 4, 5 or 6, rates only apply via Denver, CO., Cheyenne, WY., or Sidney, NE., thence via gateways opposite destinations in TCFB Tariff 5 (See Item 115) except that in connection with the ATSF, rates will

---

1. We have incorporated on the last page of this opinion that map which Shippers designated as Appendix A in their brief. In describing this map Shippers stated:

 In order to facilitate understanding of the various routes involved in this case, we have attached as Appendix A to this brief a color-coded map which depicts these routes. This map was introduced as evidence before the Commission on behalf of petitioners by Witness Irlandi, and is reproduced in the Joint Appendix (297) in black and white. As more fully described by Witness Irlandi (J.A. 273–

274), the red route is the Santa Fe–California Junctions route which has been used by petitioners. The blue routes also include Santa Fe, but may not be used in conjunction with the Part 5 rates; instead, those routes require use of the substantially higher Part 4 rates. The Part 5 rates are available over the yellow and green routes, but those routes do not include the Santa Fe and therefore would not afford access to petitioners' Kansas grain elevators.

Shippers' brief, Footnote 3 at p. 5.

not apply to points in California taking Rate Basis 4 or 6 when traffic is interchanged between the ATSF and SP at El Paso, TX., or Deming, NM. Rates will also apply via BN, Superior, NE, ATSF . . . thence via California junctions with destination carriers from points for which routing via Superior, NE, is provided in Item 4905.

The first sentence of this note clearly precludes application at the interchange points designated because the gateway restrictions of Tariff 5 are listed, and also because interchange is prohibited at El Paso and Deming, the only other interchange points between SP and Atchison, Topeka and Santa Fe Railway (ATSF) which allow access to Imperial Valley.

The second sentence of Note 33(d) 2 provides an additional routing via Superior, NE if the routing is named in Item 4905. The routing involved in this proceeding is named in Item 4905. The heart of the controversy, therefore, is whether the reference to this route in Item 4905 provides an exception to the routing restrictions of Tariff 45–N.

Both the ALJ and Division 1 concluded that Note 33(d) 2 does not allow for application of the rates in Tariff 45–N for movements over the route in question. It is our opinion that these decisions are correct. Accordingly, the petition for administrative review will be denied.

The words "rates only apply" in the first sentence of Note 33(d) 2 indicates that all traffic from BN origins in Nebraska to Rate Basis 6 destinations in California must move via gateways in Tariff 5. Also the first sentence specifically precludes application of the rates to movements interchanged by ATSF and SP at El Paso and Deming. When read in conjunction with the first sentence, it is apparent that these routing restrictions were intended to apply at Superior, as well as Denver, Cheyenne and Sidney. The second sentence was intended to establish an additional interchange point at Superior and not to operate as an exception to the routing restrictions of the preceding sentence. Each sentence of an item must be read in conjunction with the entire item, just as each item must be read in conjunction with the entire tariff.

\* \* \* \* \* \*

. . . When read in conjunction with the first sentence, it becomes clear that the second sentence was not intended to operate as an exception to either the Tariff 5 designation or the interchange restriction at El Paso or Deming.

Petitioner further contends that the prior decisions failed to discuss its arguments that Tariff Circular 20 requires a reading of Note 33(d) 2 favorable to its position. These arguments are not pertinent, since Note 33(d) 2, when read as a whole, does not establish a route between Nebraska origins and Imperial Valley, CA.

Under the circumstances, we find that a declaration of general transportation importance is not warranted under section 10327(g)(1). We also do not find material error which would warrant a reopening on our own motion under section 10327(g)(2).

Jt.Appdx. at pp. 585–587.

On appeal Shippers contend: (1) the scope of this Court's review is not limited; (2) the ICC erred in disregarding the plain language of Note 33(d)(2) which clearly establishes a specific routing via California junctions; and (3) at a minimum the disputed provision is ambiguous and should be construed strictly against the railroads who drafted it. ATSF, appearing as an intervenor in support of Shippers argues that: (1) the ICC erred in disregarding the plain language of the tariff; and (2) the Commission erred in disregarding the conduct of the parties.

I.

Shippers contend that this is not a case in which a court must defer to the expertise of

the ICC, and that the proper construction of a tariff involves a question of law which the court is just as competent as the ICC to decide. Shippers cite *Durbin Paper Stock Company v. Interstate Commerce Commission*, 190 U.S.App.D.C. 139, 585 F.2d 543 (D.C.Cir.1978) for the proposition that since tariff interpretation involves a question of law, the issue may be appropriately decided by a reviewing court. Shippers also direct our attention to *Brown Lumber Co. v. Louisville & Nashville R. Co.*, 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 385 (1937) and *Great Northern R. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922).

In *Brown, supra,* the court observed:

First. The rule declares that the prescribed formula is to be applied "where no published through rates are in effect from point of origin to destination". The language used is not technical. The meaning of the words is clear. There is no ambiguity. The construction of these railroad tariffs presents, therefore, a question of law, not differing in character from those presented when the construction of any other document is in dispute. 299 U.S. at p. 397, 57 S.Ct. at p. 267.

In *Great Northern R. Co., supra,* the Court recognized the necessity for a preliminary determination to be made by the ICC when, as here, technical words or phrases are used or extrinsic evidence "may be necessary to establish a usage of trade or locality which attaches provisions not expressed in the language of the instrument":

Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the inquiry necessary for its solution. *To determine what rate,*

*rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission.* Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable and such acquaintance is commonly to found only in a body of experts. But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.

When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law. But words are used sometimes in a peculiar meaning. Then extrinsic evidence may be necessary to determine the meaning of words appearing in the document. This is true where technical words or phrases not commonly understood are employed, or extrinsic evidence may be necessary to establish a usage of trade or locality which attaches provisions not expressed in the language of the instrument. Where such a situation arises, and the peculiar meaning of words, or the existence of a usage, is proved by evidence, the function of construction is necessarily preceded by the determination of the matter of fact. Where the controversy over the writing arises in a case which is being tried before a jury, the decision of the question of fact is left to the jury, with instructions from the court as to how the document

shall be construed, if the jury finds that the alleged peculiar meaning or usage is established.[1] *But where the document to be construed is a tariff of an interstate carrier, and before it can be construed it is necessary to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attached by usage to the transaction, the preliminary determination must be made by the Commission; and not until this determination has been made, can a court take jurisdiction of the controversy. If this were not so, that uniformity which it is the purpose of the Commerce Act to secure could not be attained. For the effect to be given the tariff might depend, not upon construction of the language—a question of law—but upon whether or not a particular judge or jury had found, as a fact, that the words of the document were used in the peculiar sense attributed to them or that a particular usage existed.* [Footnote omitted]. [Emphasis supplied].

259 U.S. at pp. 291–292, 42 S.Ct. at p. 479.

█ We agree, then, that tariff construction and interpretation has been, for the most part, considered a question of law. We do not agree, however, that a "court is just as competent as the Commission to decide", such questions, *per se*, as suggested by Shippers or that the scope of our review is not limited. We cannot adopt such a standard when, as here, the the evidentiary proceeding resulted in voluminous evidence going to the "factual basis" underlying the interpretation of the tariff question in dispute. The ultimate resolution, thus, goes beyond a simple "question of law". Under these circumstances, we hold that the proper standard of review to be employed in cases of this nature is that set forth in *Dunkley Refrigerated Transport, Inc. v. United States*, 416 F.Supp. 814 (D.Utah 1976):

A court will uphold the decision of an independent governmental agency, such as the I.C.C., if the decision is within the agency's statutory powers and is supported by adequate findings that are based upon "substantial evidence." *E. g., Illinois Central Railroad v. Norfolk & Western Railway*, 385 U.S. 57, 87 S.Ct. 265, 17 L.Ed.2d 162 (1966); *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 535–36, 66 S.Ct. 687, 90 L.Ed. 821 (1946); *Dunkley Refrigerated Transport, Inc. v. United States*, 253 F.Supp. 891, 892 (D.Utah 1966). "Substantial evidence" is normally defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' . . '[E]nough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' . . . [T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The court cannot inquire into the wisdom of the decision. The agency's findings must be accepted if, after looking at the record as a whole, the court finds that they are supported by substantial evidence. *E. g., United States v. Pierce Auto Freight Lines, supra*, 327 U.S. at 535–36, 66 S.Ct. 687. Furthermore, there is a presumption in favor of the validity of I.C.C. orders and the plaintiff bears the burden of showing the invalidity of the order. *I.C.C. v. City of Jersey City*, 322 U.S. 503, 512–13, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944). If the plaintiff can meet its burden of showing that the Commission's orders are not based on substantial evidence, the court will remand the case to the I.C.C. for a proper determination. *National Freight, Inc. v. United States*, 359 F.Supp. 1153 (D.N.J.1973).

In addition to being within the administrative agency's power and based on substantial evidence, an I.C.C. order must also be sufficiently clear and complete so a reviewing court need not guess as to its

rationale. *National Trailer Convoy, Inc. v. United States*, 293 F.Supp. 634, 637 (N.D.Okla.1968). This does not mean that the Commission's findings must be complete on every issue. The requirements of the Administrative Procedure Act are met if the order is sufficiently clear and complete to enable the reviewing court to discern with confidence the Commission's conclusions and the underlying reasons. *Alabama Great Southern Railroad v. United States*, 340 U.S. 216, 227–28, 71 S.Ct. 264, 95 L.Ed. 225 (1951). The Supreme Court has declared that:

> While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., supra*, 419 U.S. [281] at 285–86, 95 S.Ct. [438] at 442, 42 L.Ed.2d 447. Under this standard, the abbreviated orders issued by the I.C.C. may be sufficient and such orders have been upheld by the courts. *E. g., Carolina Freight Carriers Corp. v. United States*, 307 F.Supp. 723 (W.D.N.C.1969). 416 F.Supp. at p. 819.

 Applying the *Dunkley, supra*, standard to the facts and circumstances re-flected by the record before us, we hold that the ICC properly denied Shippers' requested declaratory relief. The decision was within the agency's statutory powers; furthermore, it is supported by adequate findings, based upon substantial evidence. If, as Shippers contend on appeal, the tariff question here in dispute is limited exclusively to a question of law, it is difficult to perceive why they undertook the time and expense of protracted administrative review proceedings, including that leading to the initial decision by Division 1, a *de novo* hearing before an administrative law judge, an administrative appeal to Division 2, and a subsequent discretionary review by the entire Commission. Having opted for this type of administrative review, Shippers cannot convincingly now contend that the tariff question presented is strictly a "question of law".

### II.

Having determined that the ICC's denial of Shippers' requested declaratory relief was within its power, supported by adequate findings based upon substantial evidence, we conclude that the remaining allegations of error raised by Shippers and ATSF do not merit specific consideration.

WE AFFIRM.